# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3875-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

M.M.,

    Defendant-Appellant.

_____

Submitted January 29, 2024 – Decided March 13, 2024

Before Judges Chase and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 11-07-0761.

Robert C. Pierce, attorney for appellant.

William A. Daniel, Union County Prosecutor, attorney for respondent (Michele C. Buckley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant M.M.[1] appeals from the trial court's August 15, 2023 order denying his motion to be discharged from Krol[2] status and ordering his caregivers to begin the discharge planning process from Greystone Park Psychiatric Hospital ("Greystone").  We affirm.

I.

We summarize the facts and procedural history most pertinent to this appeal from the record.  In January 2011, while wielding a tomahawk and knife, defendant gravely injured two women and brutally attacked the neighbor who came to their rescue.  At his original trial, defendant advanced the theory that during the incident he was under the influence of then-legal synthetic marijuana to the extent that he was pathologically intoxicated, and his use of the drug triggered a rare substance-induced psychosis.  After defendant's conviction was reversed, on re-trial defendant raised an insanity defense and waived a jury trial.  The trial court found him not guilty by reason of insanity ("NGRI") and ordered he be evaluated at Greystone.  The trial court then entered a judgment of acquittal and sentenced defendant to an aggregate maximum sentence of forty-five years of Krol supervision.

_____

[1]  Pursuant to Rule 1:38-3(f)(2), we use initials to preserve anonymity.

[2]  State v. Krol, 68 N.J. 236 (1975).

Defendant was continued on commitment status at his initial Krol hearing. Before his summer 2023 periodic review, defendant moved for discharge from Krol supervision. Both the State and defendant presented expert testimony at the hearing.

Defendant's psychiatrist, who evaluated him for approximately six months at Greystone, testified on behalf of the State. He was qualified as an expert in psychiatry. He believes defendant suffers from cannabis and synthetic marijuana use disorder with psychotic symptoms (currently in remission). He testified defendant was on the least restrictive level at Greystone and had no problems with his behavior. He opined if defendant was released to an unsupervised setting and started using drugs again, it could lead to another psychotic decompensation. He recommended continuation on Krol status and the commencement of discharge planning.[3] Although the State's expert did not review all the testimony from the jury trial and was unaware that defendant's girlfriend testified defendant had decompensation issues before using the

---

[3] At the Krol hearing on February 21, 2024, defendant was conditionally discharged from inpatient treatment and confinement at Greystone to the care of his father in Montana. Both parties agree defendant's appeal is not moot because he contends he should have been permanently discharged from Krol status.

synthetic marijuana, the court accepted the opinion for "the purpose of this decision."

The court recognized defendant's expert in psychiatry. He evaluated defendant on two occasions, first in December 2011 and more recently in July 2023, to determine whether defendant demonstrated any symptoms of mental illness. The expert first testified to the December 2011 evaluation, where he found defendant did not demonstrate any symptoms of mental illness, and he did not find defendant to be a danger to himself or others. He noted this evaluation took place eleven months after the incident occurred, but at the time of the evaluation no such symptoms were present.

Defendant's expert then explained the concept of synthetic cannabinoid-induced psychotic disorder. He opined defendant suffered from this disorder and concluded it was "within reasonable medical certainty . . . the condition that [defendant] had [at the time of the incident]." He further found defendant acquired those symptoms involuntarily, "even though his using [synthetic cannabis] was seemingly voluntary."

Defendant's expert then testified to the July 2023 evaluation. His report from this evaluation indicated defendant was able to exhibit normal, coherent behavior, and was in full command of both his physical and cognitive abilities.

A-3875-22

He further testified his evaluation did not reveal any "delusional ideas and/or hallucinations," and any of defendant's previously observed symptoms were drug-induced.

The expert referred to defendant's prior testimony where he gave insight into his behavior as it related to substance abuse and explained psychiatrists in his field place significant weight on an individual's insight into their own substance abuse because it demonstrates the ability to draw "cause and effect connections . . . between behavior that they had and an underlying problem." He clarified while defendant's insight may not demonstrate the absence of a psychiatric disorder, it does demonstrate a commitment to sobriety and concluded it was his opinion defendant does not require psychiatric care, there are no indications defendant is a danger to himself or others, and defendant should be permitted to return to Montana, where defendant's father resides.

On cross-examination, the State asked defendant's expert whether statements from defendant's girlfriend describing defendant's behavior as "bizarre and of a hallucinatory nature that predated [defendant's] use of the cannabinoid" would cause him to alter his opinion of defendant's mental state. He testified such statements would not change his opinion. When asked whether knowing the State's medical expert changed his opinion upon learning this

information would cause him to change his opinion, he again replied such information would not change his opinion. The expert testified the information presented in the State's hypothetical would not change his opinion because it was "not consistent with [his] findings" and he was unwilling to consider any new information pertaining to defendant's behavior that might otherwise invalidate his finding of synthetic cannabinoid-induced psychotic disorder.

The trial judge addressed the defense expert's testimony, stating "I'm not so sure that I find [him] to be credible, given his argumentative nature and inflexibility when faced with hypothetical questions." The trial judge later ruled he was not a credible witness and rejected his testimony because he acted more "like an advocate than an impartial witness."

Defendant also testified on his own behalf. He recognized his use of synthetic marijuana and blamed it for his actions. He explained he wanted to move to Montana to live and work with his father. He testified he was willing to follow any discharge plan put in place and had participated in substance abuse programs and would continue to do so. Moreover, he had not had any relapse of psychiatric symptoms. The court found defendant testified in a direct and forthright manner.

The trial court held defendant had been diagnosed with cannabis use disorder and synthetic marijuana use disorder with psychotic symptoms, which were currently in remission. It noted defendant agreed with this diagnosis in his testimony and understands drugs bring out a psychosis in him. Further, the court observed in defendant's case, "drugs bring out a substantial disturbance of thought, mood, perception, or orientation, as evidenced by his behaviors in the underlying case." Therefore, the trial court found he suffered from a mental illness. Additionally, the court found defendant was doing well, did not need more intensive supervision, and should continue his progression to a less restrictive environment. Defendant's caregivers were thus ordered to begin the discharge process and present an appropriate plan.

On appeal defendant argues:

> POINT I.
>
> THE TRIAL COURT ERRED BY DENYING [M.M.'S] MOTION TO BE DISCHARGED FROM KROL SUPERVISION AS THE STATE DID NOT PROVE THAT HE IS A DANGER TO HIMSELF, OTHERS OR PROPERTY.

II.

We are guided by well-settled principles of law governing NGRI acquittees. Such persons "may be held in continued confinement if the person

7

is a danger to self or others and is in need of medical treatment." In re W.K., 159 N.J. 1, 2 (1999). The purpose is not to punish, but "to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." Krol, 68 N.J. at 246.

Once committed, NGRI acquittees "are reviewed on a periodic basis under the same standards as those applied to civil commitments generally." In re M.M.,[4] 377 N.J. Super. 71, 76 (App. Div. 2005), aff'd, 186 N.J. 430 (2006). One important exception is "that the burden for establishing the need for continued commitment is by a preponderance of the evidence, whereas in a civil commitment proceeding it is by clear and convincing evidence." W.K., 159 N.J. at 4; see also N.J.S.A. 2C:4-8(b)(3) (establishing preponderance of the evidence standard of proof). "[A]n NG[R]I defendant may remain under Krol commitment for the maximum ordinary aggregate terms that defendant would have received if convicted of the offenses charged, taking into account the usual principles of sentencing." W.K., 159 N.J. at 6.

"Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future." M.M., 377 N.J. Super. at 76 (quoting Krol, 68 N.J. at 260). The focus is on whether the defendant "presently

---

[4] Unrelated to the instant matter.

A-3875-22

poses a significant threat of harm, either to himself or to others." Krol, 68 N.J. at 247; see also M.M., 377 N.J. Super. at 76. The determination of "dangerousness" is "a legal one, not a medical one." Krol, 68 N.J. at 261. The statutory standard incorporates those two variables: "Dangerous to self" and "Dangerous to others or property." N.J.S.A. 30:4-27.2(h), -27.2(i).

"'Dangerous to others or property' means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." N.J.S.A. 30:4-27.2(i) (emphasis added). Notably, the statute employs three distinct concepts: "serious bodily harm," "substantial bodily injury," and "serious physical harm."

Unavoidably, "[d]etermination of dangerousness involves prediction of defendant's future conduct rather than mere characterization of . . . past conduct." Krol, 68 N.J. at 260-61. Yet, a "defendant's past conduct is important evidence as to his probable future conduct." Id. at 261. As the statute directs, the dangerousness determination "shall take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration." N.J.S.A. 30:4-27.2(h), -27.2(i).

The determination requires a "delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy." Krol, 68 N.J. at 261. In crafting restraints to reduce the risks an NGRI acquittee poses, "[d]oubts must be resolved in favor of protecting the public, but the court should not, by its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal." Krol, 68 N.J. at 261-62; see also State v. Ortiz, 193 N.J. 278, 292 (2008).

Also, "[o]rders, either requiring institutionalization or imposing lesser restraints are subject to modification on grounds that [the] defendant has become more or less dangerous than he was previously, or termination, on grounds that he is no longer mentally ill and dangerous, on the motion of either the State or the defendant." Krol, 68 N.J. at 263. An NGRI acquittee may be conditionally released if the court deems it appropriate. Id. at 262. If conditionally released, an NGRI acquittee must remain subject to periodic review by the court. Ortiz, 193 N.J. at 293.

The Court has recognized that in almost all cases where a committee has demonstrated improvement, gradual reduction of restraints is almost always appropriate, and sudden, complete removal of them almost never is.

> [E]ven where the committee's condition shows marked improvement, only the most extraordinary case would justify modification in any manner other than by a gradual [de-escalation] of the restraints upon the committee's liberty. For example, where the State is unable to justify the continuance of an order for restrictive confinement, the outright release of the committee into the community without the use of any intermediate levels of restraint . . . would normally constitute a manifestly mistaken exercise of the reviewing court's discretion.
>
> [State v. Fields, 77 N.J. 282, 303 (1978) (citation omitted).]

See also In re E.D., 183 N.J. 536, 551 (2005) (favoring reductions to restraints in gradual stages over outright release).

"[T]he scope of appellate review of such judgments will be extremely narrow, with the utmost deference accorded the reviewing judge's determination as to the appropriate accommodation of the competing interests of individual liberty and societal safety in the particular case." Fields, 77 N.J. at 311. The reviewing court has the "responsibility to canvass the record inclusive of the expert testimony to determine whether the findings made by the trial judge were clearly erroneous." In re J.M.B., 395 N.J. Super. 69, 90 (App. Div. 2007) (citing In re D.C., 146 N.J. 31, 58-59, (1996), aff'd, 197 N.J. 563 (2009)). We will modify a commitment order "only if the record reveals a clear mistake." D.C., 146 N.J. at 58.

11

Defendant challenges the court's finding that he has a mental illness and is a danger to himself, others, or property. Specifically, defendant claims the trial court erroneously found defendant suffers from a mental illness because he may become psychotic if he should smoke synthetic marijuana because the experts testified defendant does not suffer from a mental illness. Defendant also claims the trial court failed to make a finding as to his dangerousness.

Relying on the testimony, the record, and the relevant law, the trial court correctly found defendant does, in fact, suffer from a mental illness as defined by N.J.S.A. 30:4-27.2(r). The trial court aptly reasoned defendant has been diagnosed with a "cannabis use disorder and synthetic marijuana use disorder with psychotic symptoms (currently in remission)," which fits the statutory definition. The court observed defendant does not suffer from simple intoxication or a transitory reaction, but rather defendant's use of drugs results in a substantial disturbance of thought, mood, perception, or orientation, as evidenced by his conduct in the underlying case. The court's finding is amply supported by the record and was not an abuse of discretion.

Specifically, the State's expert diagnosed defendant with cannabis use disorder and synthetic marijuana use disorder with psychotic symptoms. In this

regard, he testified defendant has a substance abuse problem that leads him to act out in a psychotic and delusional manner. Further, the trial court considered the trial testimony and reports of previous doctors who conducted evaluations of defendant and diagnosed him with substance-induced psychotic disorder secondary to synthetic marijuana. In fact, it had been opined that at the time of the offense, defendant suffered from an acute psychosis, consisting of "paranoid, grandiose[,] and religious delusions as well as auditory hallucinations." Accordingly, the record amply supports the trial court's finding that defendant's drug use causes an abnormal reaction, resulting in a substantial disturbance of defendant's thought, mood, perception, or orientation, which significantly impairs his judgment, capacity to control his behavior, and his capacity to perceive reality. Finally, the court relied not only on the experts' opinions, but also on the testimony of defendant, who acknowledged his use of drugs causes him to exhibit psychotic behavior.

Further, though the trial court did not specifically note in its opinion that defendant is a danger to himself and others, the court accepted the report of the State's expert, who offered the same opinion. Specifically, he noted in his report defendant remains "a danger if he is discharged to an unsupervised setting and if he starts using drugs again which may lead to psychotic decompensation."

13

The conclusion defendant remains a danger is also clearly supported by the January 18, 2023 Greystone Violence Risk Assessment, wherein defendant was found to be a moderate risk for future violence, and a high risk for serious physical harm. Additionally, and more importantly, the Greystone risk evaluation indicates that throughout his admission defendant exhibited traits including "superficial charm, grandiose self-worth, pathological lying, manipulation[,] and failure to accept responsibility for his index offense," which may influence his ability and willingness to participate in treatment within the community. The evaluator further believed these traits may influence defendant's "capacity to develop therapeutic alliance, increase insight, challenge distorted thinking, and recognize his risk for violence." The report conclusion stated defendant's history of substance abuse, along with his belief that he does not require psychological treatment in the community, indicated he would benefit from the presence of external controls to supervise his engagement in mental health and substance abuse programs. Thus, the record clearly established defendant remains a danger to himself and others given his continued need for substance abuse counseling and the high risk that he would act extremely violently if he used drugs in the future. See Krol, 68 N.J. at 260-61 (evidence of past conduct is evidential in predicting the likelihood of future

dangerousness and evaluation of the magnitude of the risk involves consideration of both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place); N.J.S.A. 30:4-27.2(h) and -27.2(i).

The trial court properly relied upon the entirety of the record, including the trial testimony, opinions of experts, and relevant law, and correctly found defendant suffers from a mental illness and is a danger to himself and others. However, the trial court also realized discharge planning was appropriate and ordered his caregivers to begin an appropriate discharge plan to be presented and implemented. Defendant's current conditional discharge reflects the appropriate course of action.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3875-22