ARTWAY, Alexander A., Appellant,

v.

PALLONE, Nathaniel J., Ph.D., Personally and As Chairman of The New Jersey Special Classification Review Board; And Frederick Rotgers, Personally And As Director of Psychological Services at Rahway State Prison.

No. 80–1980.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) on Oct. 29, 1981.

Decided Feb. 17, 1982.

Alexander A. Artway, appellant pro se.

James R. Zazzali, Atty. Gen. of New Jersey, Andrea M. Silkowitz, Deputy Atty. Gen., Trenton, N. J., for appellees; J. Michael Blake, Deputy Atty. Gen., Trenton, N. J., of counsel.

David Ferleger, Philadelphia, Pa., amicus curiae.

Before ADAMS, VAN DUSEN and WEIS, Circuit Judges.

### OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

#### I.

This appeal challenges a June 1980 final judgment of the United States District Court for the District of New Jersey, dismissing a civil rights complaint[1] seeking

1. The order was entered by Magistrate Cowen on the basis of a stipulation filed on March 12, 1980, by the parties, providing, *inter alia*: "Any order, decision, or direction by the Magistrate is stipulated and agreed to have the same force and effect as if entered by a United States District Judge." The district court granted defendant's motion for summary judgment. Also, the plaintiff had filed a motion for partial summary judgment. Both parties reserved the

declaratory and injunctive relief against state officials under the 1871 Civil Rights Act (42 U.S.C. §§ 1981 & 1985). The judgment was based on a record consisting of the pleadings, affidavits, and answers to interrogatories. For the reasons stated in this opinion, we will affirm the above judgment.

## II.

This action arises out of plaintiff's May 1971 conviction of sodomy based on a jury verdict of the defendant's guilt and the subsequent determination by the trial and sentencing judge that (1) his conduct was characterized by a pattern of repetitive, compulsive behavior, and (2) violence was used in the commission of the offense. Although plaintiff contends that he did not commit sodomy, that any actions by him in relation to the victim were not done forcibly or with violence, and that the victim consented to all actions by all three male defendants on the November 1968 date of the crime,[2] the testimony of the victim in the transcript of plaintiff's May 1971 criminal trial does not support such contentions. The transcript of that trial, during which he was found guilty of sodomy beyond a reasonable doubt by a jury, contains testimony by the victim that the actions of the defendants were violent and that she did not consent to them.[3] These assaults on her person by the defendants, as stated in her testimony, included sodomy committed by plaintiff who was a defendant in that criminal proceeding. See, for example, N.T. 42–48, 92–110, 116 & 132, State v. Artway, et al., New Jersey Superior Court, Criminal Law Division, Indictment No. I–311–68, Transcript of May 1971 trial, and June 24, 1971 Transcript containing ruling of the trial judge denying motion for new trial at N.T. 12–13. On appeal, the New Jersey Superior Court, Appellate Division, after reviewing the trial court record, concluded that the jury was justified in finding that "the act of sodomy was performed" and would have been justified in finding that the act was committed "forcibly against her will" were force an element of the offense. See State v. Artway, No. A.2817–74, Opinion of March 20, 1978, p. 3.

At the sentencing proceeding on March 27, 1975,[4] the trial judge stated:

"... I don't think we accomplished a thing in five years and by accomplishment I mean bringing him around mentally, emotionally to the point that he realizes this a number of years ago was a vicious, sick, awful, violent and forceful thing.

· "Now, Menlo Park has categorized this man as compulsive and repetitive, which means that he is going to do it again, given the correct circumstance.... [T]his man is violent. What he and these two men did to that teenage kid out in the woods was sick.

"... they abused this kid, they humiliated her, committed Sodomy on her and played with her,...."

A jury had previously found the plaintiff guilty of sodomy beyond a reasonable doubt in September 1969, but the Appellate Division of the New Jersey Superior Court granted him a new trial. Therefore, two different juries on two separate occasions have unanimously found Alexander Artway guilty of sodomy beyond a reasonable doubt on the basis of the testimony of his female victim and the medical experts and rejected the testimony of Artway and his two male friends.

---

right to offer testimony in the event the court ruled in plaintiff's favor on his motion.

2. For example, at page 5 of the complaint, plaintiff contends that the "entire record shows no evidence of violence or dangerousness."

3. The victim testified that she was forced to take off all her clothes by the three defendants, who then tied her to a tree in a wooded area, at which time the sodomy was committed by plaintiff. During her ordeal, lasting well over an hour according to her testimony, the victim was released from being tied to the tree and subjected to further assaults, including urinating on her head and hair, by plaintiff and his two friends and was forced to pose nude in various positions while pictures were taken of her.

4. Plaintiff was a "fugitive from justice" living away from New Jersey (p. 3 of March 1975 sentencing proceeding) from the spring of 1971, after his second conviction of sodomy by the jury, until he surrendered himself to the New Jersey authorities about January 1, 1975.

"This man has to understand that he is sick, he is sick right now as he stands here today like he was five years ago. . . .

\* \* \* \* \* \*

"He today does not have the proper attitude towards treatment. Until he takes the first step and recognizes that he has got a problem, and an emotional problem the doctors can help him with he is never going to get anywhere.

"If he can ever bring himself to the place where he is honest with himself and admits to himself that he needs treatment and accepts help up there at that unit, then he will start to work himself out of this hole and he will get out of there in a limited time.

"I don't know whether he is ever going to come around but I don't like the present attitude, the present change of mind towards the authorities, that is he resents and thinks the doctors are wrong, he doesn't think there is anything wrong with him, he thinks he ought to be able to go free.

"Well, that's simply not so, he is wrong and all the doctors are in agreement that he is wrong. And he is simply not going to go free to hurt or humiliate or abuse anybody else.

\* \* \* \* \* \*

" . . . this many psychiatric reports with this many doctors saying the same thing, can't be wrong, that he had better face up to the fact that he has got a problem and start getting help with it.

"All right, because of the finding, Artway, that you're [compulsive] or repetitive because of the brutal nature of this sexual offense against this young woman, I have no choice but to sentence the law and this court that you be confined to a [sic] indeterminate period at the New Jersey State Prison Farm at Rahway, the Diagnostic Unit."

Transcript of March 27, 1975, proceedings at Mount Holly, N. J., Superior Court of New Jersey, Burlington County, Criminal Division, No. I–311–68, pp. 6–10.[5]

Plaintiff was sentenced at the March 27, 1975, proceeding to an indeterminate term with a 20-year maximum.[6] At that time, N.J.S.A. 2A:164–8 contained these terms:

5. Although the issue in this case is the adequacy of the SCRB and related proceedings and, thus, the question of Artway's initial sentencing is not before us, we cannot agree with the amicus curiae's criticism of the March 27, 1975, sentencing hearing, where a determination of the applicability of the Sex Offender Act was made, as "lackadaisical proceedings" by the New Jersey Superior Court, which were sanctioned by the United States District Court. The record makes clear that Artway's two defense counsel had secured and examined both the Menlo Park reports and the report of the probation officer concerning plaintiff (defendant in the Superior Court) at that time. See N.T. 2–5. We note that in *State v. Dalonges*, 128 N.J.Super. 140, 319 A.2d 257, 258 (1974), the New Jersey Superior Court, Appellate Division, rejected without analysis an attack on a Diagnostic Center report which was not challenged at the time of sentencing. Although the defendant had the right to challenge the "accuracy and validity of the factual and conclusional assertions" in the Menlo Park and Probation Reports and to cross-examine the psychologists who made them, *State v. Horne*, 56 N.J. 372, 374, 267 A.2d 1, 2 (1970), he did not make such a challenge at his sentencing. The record is clear that the only challenge made at that time was to the conclusion that Artway had acted violently, which was made by the sentencing judge and based upon both the reports and the trial testimony. *See* N.T., sentencing hearing, at 5–8.

At N.T. 8, the judge commented on the refusal of the defendant to accept treatment for his compulsive and repetitive violent tendencies, as set forth in notes 3 & 4 above, concluding:

"Now, Artway, I suggest that you wake up and get honest with yourself. I repeat, you are intelligent enough, you should have learned by now. Statutory rape with another kid in Philadelphia in 1965, they gave you a break and put you on probation, then you went out and committed this terrible crime."

6. Article 2 of the New Jersey Statutory Rules of Criminal Procedure contained the following provisions in 1975:

"ARTICLE 2. TREATMENT OF SEX OFFENDERS

"2A:164–3. Sex offenses; diagnostic center; commitment; examination; determination of legal settlement

"Whenever a person is convicted of the offense of . . . sodomy, . . . or of an attempt to commit any of the aforementioned offenses, or assault with intent to commit . . . sodomy, the judge shall order the commit-

"Any person committed to confinement, as provided for in section 2A:164–6 of this title, may be released under parole supervision when it shall appear to the satisfaction of the state parole board, after recommendation by a special classification review board appointed by the state board of control of institutions and agencies, that such person is capable of making an acceptable social adjustment in the community. It shall be the duty of the chief executive officer of any institution wherein such a person is confined to report in writing at least semiannually to the commissioner concerning the physical and mental condition of such person with a recommendation as to his continued confinement or consideration for release on parole. The state board of control of institutions and agencies is hereby authorized and empowered to promulgate rules and regulations for the parole, revocation thereof for cause, and the proper supervision on parole of said persons when released from confinement."

The Supreme Court of New Jersey has interpreted the statutory scheme contained in the above-quoted N.J.S.A. 2A:164–3 et seq. (see footnote 4 and N.J.S.A. 2A:164–8 quoted in the text above), in *State v. Clark*, 65 N.J. 426, 323 A.2d 470, 472–75 (1980), as follows:

"The purpose of the sex offender act is cure through treatment of aberrations which caused the sexually deviant offenses rather than punishment. To that end the act provides for release under parole supervision 'when it shall appear to the satisfaction of the state parole board, after recommendation by a special classification review board appointed by the state board of control of institutions and agencies, that such person is capable of making an acceptable social adjustment in the community.' N.J.S.A. 2A:164–8. The converse is that if one so committed does not so respond to treatment and remains a menace to the community, he may be retained in confinement for the maximum term authorized for the crime of which he was convicted. [Citing cases.]

\* \* \* \* \* \*

"The scheme of our sex offender act, as previously indicated, is the specialized institutionalization of those sex deviants

---

ment of such person to the Diagnostic Center for a period not to exceed 60 days. While confined in the said Diagnostic Center, such person shall be given a complete physical and mental examination....

"2A:164–4. Report on examination

"Upon completion of the physical and mental examination of such person, but in no event later than 60 days after the date of the order of commitment, a written report of the results thereof shall be sent to the court.

"2A:164–5. Specialized treatment, when

"If it shall appear from said report that it has been determined through clinical findings that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior; and ... if ... violence was utilized in the commission of the offense; ... it shall be the duty of the court, upon recommendation of the Diagnostic Center, to submit the offender to a program of specialized treatment for his mental and physical aberrations.

"2A:164–6. Disposition of sex offenders upon request and recommendation of diagnostic center

"The disposition to be made by the court of such person, upon written report and recommendation of the diagnostic center, shall include 1 or more of the following measures:

\* \* \* \* \* \*

"b. Such person may be committed to an institution to be designated by the commissioner of institutions and agencies for treatment, and upon release shall be subject to parole supervision.

"In the event that the court shall order a commitment of the person as provided in this section, such order of commitment shall not specify a minimum period of detention, but in no event shall the person be confined or subject to parole supervision for a period of time greater than that provided by law for the crime of which such person was convicted.

"2A:164–7. Treatment, arrangement for

"The commissioner of the department of institutions and agencies, upon commitment of such person, shall thereupon arrange for his treatment in 1 of the institutions under the jurisdiction of the department which, in the judgment of the commissioner, is best suited to care for the needs of such person...."

Pursuant to the recently enacted New Jersey Code of Criminal Justice enacted by L.1978 C.95 effective September 1, 1979, the provisions on sex offenders are now contained in N.J.S.A. 2C:47–1 et seq.

whose abnormal conduct has resulted in conviction for certain designated sexual crimes, is compulsive and repetitive, and either is accompanied by violence or is imposed upon a victim under 15 years of age. The inherent legislative finding underlying the act is that such persons are suffering from mental and physical illness involuntarily causing their conduct, for which criminal incarceration, whether thought of as punishment or as a deterrent, will accomplish nothing; the same conduct will be repeated after release. The further assumption has to be that, in many cases, they will respond to specialized treatment and can be restored to normal, law-abiding lives. So they are to be paroled under supervision as soon as they are found 'capable of making an acceptable social adjustment in the community,' but in those cases where treatment is not effective, they are to remain institutionalized for the protection of society for the maximum period for which they could have been criminally sentenced for the crime involved. See history of the act and discussion in *State v. Wingler, supra* (25 N.J. at 169–176, 135 A.2d 468); *State v. Lee,* 60 N.J. 53, 54–57, 58, 286 A.2d 52 (1972). The whole thesis is commitment for treatment instead of a sentence for punishment, to which the judiciary must give appropriate recognition and sympathetic effect. We must also have confidence that the staff of the sex offender treatment unit, the special classification review board and the state parole board will carry out their heavy responsibilities conscientiously and fairly so that, on the one hand, sex offenders will not be released to the community until there is a reasonable certainty that repetition of the conduct will not occur and, on the other, that a person is not detained longer than is necessary to accomplish that end.

"... The long-time pattern of repetitive and compulsive behavior toward children and young males made it clear that defendant was ill, a menace and much in need of confinement and exposure to treatment...."

(Footnotes omitted.)

### III.

The complaint seeks

(a) declaratory relief holding that defendants [7] have violated the constitutional [8] and civil rights of plaintiff;

(b) injunctive relief requiring plaintiff be given

(1) the right of review periodically of his Special Classification Review Board (SCRB) folder,

(2) a comprehensive statement of reasons for parole denials,

(3) an in-person SCRB review at least once every two years and an immediate SCRB review at this time, and

(4) expungement of defendant Rotgers' report from plaintiff's SCRB folder;

(c) "compensatory and punitive (or nominal) damages ...;" and

(d) litigation and court costs.

Defendant Pallone has described the procedure used by the SCRB as follows in paragraphs 2 and 3 of an affidavit filed with the district court on September 28, 1979 (Document 16 in D.N.J. Civil No. 79–2258):

"2. The Special Classification Review Board ('SCRB') is empowered by statute (N.J.S.A. 2A:164–8) to review all patients placed under the New Jersey Sex Offender Act (N.J.S.A. 2A:164–3–13 inclusive) for possible parole consideration by the State Parole Board.

"3. For an inmate confined at an institution within the State Prison, e.g.,

---

**7.** Pallone is sued personally and as chairman of the New Jersey Special Classification Review Board (SCRB). Rotgers is sued personally and as Director of Psychological Services at the New Jersey State Prison. The unsworn complaint alleges that the defendants conspired to deny plaintiff his constitutional and civil rights by including false and untrue and misleading statements in official records.

**8.** Plaintiff claims denials of his "Fourth, Eighth, and Fourteenth Amendment Rights" (see p. 5 of brief filed June 16, 1980).

plaintiff Artway, the following procedure is utilized by the Special Classification Review Board in determining whether to refer a sex offender to the State Parole Board for parole consideration. The offender is assigned a therapist who, every six months, prepares a report which delineates the background, history and current status of the offender, which includes the degree of progress which he has made toward resolving his deviant sexual behavior. The therapist recommends whether the offender needs additional treatment designed to cure the aberration or whether he should be recommended for parole consideration. (Additionally, the therapist may recommend at any time to the SCRB that the offender be recommended to the State Parole Board). The offender is permitted to read the report and discuss it with the therapist. If the offender agrees with the report, he signs the same evidencing his acceptance of the findings of the therapist. However, should the offender object to the report, he is allowed to voice his objections thereto and to submit his comments in writing. The therapist's report and any comments submitted by the offender are then forwarded to the SCRB, which evaluates all cases whether or not parole consideration has been recommended by the therapist. In general, if the therapist makes a positive recommendation the SCRB defers decision and refers the case to the treatment staff at the Adult Diagnostic and Treatment Center for their in-person evaluation and report on the offender to the SCRB, which includes their findings and a conclusion as to whether the offender should be recommended for parole consideration. Also, the SCRB normally conducts an in-person interview of those offenders who have received favorable recommendations. The SCRB then determines whether the offender, in their view, is capable of making an acceptable social adjustment in the community. Whether or not the SCRB recommends parole consideration, the offender receives a notice of decision of the SCRB which indicates, if parole has not been recommended, what the offender may do in order to enhance his chances of being recommended."

The record contains, *inter alia*, this evidence of the consideration given to plaintiff by the New Jersey authorities responsible for administering N.J.S.A. 2A:164–7 & 8:

1. A document entitled SEMIANNUAL INTERVAL NOTE, dated February 1976, by Edward Stockwell (attachment to Document 19 in D.N.J. Civil No. 79–2258) concerning plaintiff reads as follows:

"This man continues to be unrealistic, he rationalizes his own views intellectually, justifies through creating confusion over an issue, evades responsibilities toward society's rules, all of which seem to be telling us that these are his ways of compensating, denying and hiding his feelings of insecurity as a male as well as his deep feelings of inadequacy. He tends to avoid reality so that he can avoid admitting problems.

"He participates actively in therapy but usually in a defensive manner or in empathy of another. He represses negative feelings both for himself as well as others.

"He has not been able to go into any dynamics of his crime principally because of his inability or fear of being known.

"He appears intellectually capable and this tends to assure me that his prognosis can be considered good to excellent. First, however, he must be able to become trusting and confident in being open and real.

"Recommendation: Continued Therapy"

2. An inter-office communication from Treatment Staff dated March 28, 1978 (labeled p. 7 of P4 and attached to Document 19 in D.N.J. Civil No. 79–2258), contains this wording:

"STAFF NOTE: After careful consideration of your case, the staff agrees with your therapist's report as stated. The staff notes your lack of involvement in therapy and if this stance continues, the chance of institution transfer may be considered."

3. Defendant Pallone's answer to interrogatory 11 of plaintiff (Document 20 filed 11/20/79, D.N.J. Civil No. 79–2258) states that plaintiff is mentally ill, using this language:

"11). Do you believe that I am mentally ill? If so, detail your proofs; and provide a copy of any documents relied upon.

"Yes. Repetitive aberrant sexual behavior constitutes a mental illness. Reports of psychiatric examinations conducted at Menlo Park Diagnostic Center on 12/10/69, 7/12/71 and 2/25/75 and other psychological reports, including the recent report of Mr. Rotgers, each so attests."

4. Interrogatory 16 and the answer thereto in the same Document 20 referred to under 3 above contain this wording:

"16). Explain in detail your rationale for concluding that I am not capable of making an acceptable social adjustment in the community.

"The SCRB considered it to be particularly significant that Mr. Rotgers had opined that you showed strong paranoid and psychopathic personality features, that you were evasive and avoided dealing with yourself and that you showed 'clear evidence of character disorder.'

Also highly significant was Mr. Rotger's opinion that it was problematical whether you could function in society without further sexual offenses. Another significant factor was that you had been transferred to Rahway State Prison from the Adult Diagnostic and Treatment Center in May 1978 due to your general lack of involvement and participation in the treatment program there. Furthermore, since your confinement at Rahway State Prison, you had refrained from participating in therapeutic rehabilitative programs available to you that might aid you in the resolution of your problems. Thus you exhibited a lack of interest in your own rehabilitation. Therefore the SCRB determined that you were not capable of making an acceptable social adjustment in the community."

Plaintiff contends that (1) the test of being "capable of making an acceptable social adjustment in the community" contained in N.J.S.A. 2A–164–8 must be based on medical opinions and past behavior; (2) his behavior must fall under the description "present dangerousness by reason of mental illness (or sexual compulsion)" to justify denial of parole for the period of over five years that he has been confined for treatment;[9] and (3) he must be permitted "to

---

**9.** We note that in *State v. Fields*, 77 N.J. 282, 302, 390 A.2d 574, at 579, 580, 584 (1978), the New Jersey Supreme Court has recently used the following language with reference to persons committed for treatment as the result of a finding that they were not guilty of a criminal charge by reason of insanity:

"If the State is satisfied that continuance of the current restraints would be adequate, it must demonstrate only that there has been no material change in the committee's condition and degree of potential dangerousness which would warrant a relaxation of the prevailing level of restraints upon his liberty...."

In reaching the above conclusion, the court quoted this wording from *O'Connor v. Donaldson*, 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975):

"Nor is it enough that [the committee's] original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed."

The court also quoted this wording from *State v. Krol*, 68 N.J. 236, at 260–61, 344 A.2d 289, at 302 (1975):

"Determination of dangerousness involves prediction of defendant's future conduct rather than mere characterization of his past conduct. Nonetheless, *defendant's past conduct is important evidence as to his probable future conduct.* [Citing cases.] *It is appropriate for the court to give substantial weight to the nature and seriousness of the crime committed by defendant and its relationship to his present mental condition.*[12]

"It should be emphasized that while courts in determining dangerousness should take full advantage of expert testimony presented by the State and by defendant, the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal

review and refute the records upon which defendants rely in their decision making process."

Although the SCRB has reviewed plaintiff's case several times pursuant to N.J. S.A. 2A:164–3, it has not referred him to the State Parole Board for parole consideration under N.J.S.A. 2A:164–8 (above at typescript pp. 1171–1172; see also Pallone affidavit at pp. 8–9).[10] Subsequently, the SCRB again considered plaintiff for possible referral to the State Parole Board in accordance with the procedure described at typescript pp. 1172–1173 above. At that time, the SCRB considered an April 25, 1979, report of Frederick Rotgers, psychologist and Director of Psychological Service at Rahway, which included this wording:

"Mr. Artway was interviewed for an SCRB review. Although he previously declined to participate in reviews here, today he spent some 50 minutes with the examiner.

"Mr. Artway is an intelligent, fairly articulate individual who shows strong paranoid and psychopathic personality features. He tends to be evasive in a very legalistic and technical manner by weaving a complex web of legalistic argument, thus avoiding dealing with himself.

"Mr. Artway denied that the offense he is convicted of was an actual offense. While admitting to fellatio with the girl, he denies any sodomy and says that there was no force involved. It is difficult, in spite of his conviction by a jury, to assess the actual fact in this case. Due to Mr. Artway's mild evasiveness regarding the offense, it was also difficult to elicit clear evidence of a compulsive aspect to his sexual behavior. While Mr. Artway shows clear evidence of a character disorder, the results of the interview are much less clear regarding his potential to function in society without further sexual offenses.

"Mr. Artway clearly has the intellectual capacity, and the perserverance necessary to function on the outside. He is older, more mature and appears more stable than when the offense was committed. At this point, I have no reason to conclude that Mr. Artway could not succeed on parole." [11]

---

liberty and autonomy. This decision, while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one.

"[12] Empirical studies suggest that prior criminal conduct is an important factor—perhaps the most important—in the prediction of future dangerous conduct. Kozoi, Boucher & Garofalo, 'The Diagnosis and Treatment of Dangerousness,' 18 Crime & Delinq. 371, 384 (1972); Rubin, *supra* at 400; *see generally* 'Developments—Civil Commitment of the Mentally Ill,' 87 Harv.L.Rev. 1190, 1244 (1974)."

We note that plaintiff's position is significantly different from that of a person found not guilty by reason of insanity, since he is confined because he has been found guilty by a jury of the crime of sodomy. *See* note 14 below.

**10.** On April 2, 1979, subsequent to one such failure of the SCRB to refer plaintiff's case to the Board, plaintiff filed in the Superior Court of New Jersey, Burlington County, a "Motion for Leave to Proceed In Forma Pauperis on Appeal from Administrative Decision" and a "Letter Motion to Compel Comprehensive Judgment Etc.," which motions were denied on May 3, 1979.

**11.** In answer to interrogatory 31, defendant Rotgers stated he meant by the last sentence of his report that "there was no evidence that would convince me that plaintiff could not succeed on parole" and that the entire report "speaks for itself." Interrogatory 34 and Rotgers' answer to it read as follows:

"34). Exhibit the evidence which you believe shows Mr. Artway's 'strong paranoid and psychopathic personality features.

"The report I prepared for plaintiff speaks for itself; however, plaintiff's suspiciousness and evasiveness during the interview, his picayune and minute legalistic arguments about the title of his offense, and his use of denial and projection as defense mechanisms, all suggest paranoid features. "Psychopathic features are evidence in that he has a repetitive history of criminal acts for which he feels little remorse or concern. He could see nothing wrong for example, in promising money to the victim (his version) for sexual favors and then not paying. He is not completely truthful in his accounts of various events. He does not appear able to empathize with others. He acts impulsively without considering all the facts available to him, or the consequences of his actions. His actions often have a 'self-defeating' quality e.g. refusing further therapy at A.D.T.C., even though he knows a positive referral from a therapist can be important for parole. All of

After such consideration, the SCRB determined that plaintiff "was not capable of making an acceptable adjustment in the community" for these reasons stated in the abovementioned affidavit of defendant Pallone:

"On June 19, 1979, the Special Classification Review Board considered Alexander Artway for possible referral to the State Parole Board. The SCRB considered the report of Frederick Rotgers, psychologist and Director of Psychological Services at Rahway State Prison who had interviewed Alexander Artway and prepared a report on April 25, 1979. The SCRB did not refer Artway to the treatment staff at the Diagnostic Center nor did it conduct an in-person interview with him. Moreover, the SCRB did not concur in Rotgers' recommendation of referral to the Parole Board. The SCRB, in making its determination, considered it to be particularly significant that Rotgers, although recommending parole consideration, had opined that Mr. Artway showed strong paranoid and psychopathic personality features, that he was evasive and avoided dealing with himself, and that he showed 'clear evidence of a character disorder'. Also highly significant to the SCRB was Rotgers' opinion that it was problematical whether Artway could function in society without further sexual offenses. Finally, other significant factors considered by the SCRB were that Artway had been transferred to Rahway State Prison from the Adult Diagnostic and Treatment Center in May 1978 due to his general lack of participation and involvement in the treatment programs there, and that, since his confinement at Rahway, he had refrained from participating in therapeutic rehabilitative programs available to him that would aid him in the resolution of his problems. Thus, Artway had exhibited a lack of interest in his own rehabilitation. In view of these considerations the SCRB decided that review by a treatment team and an in-person interview before the SCRB were unnecessary. Moreover, the SCRB determined that he was not capable of making an acceptable social adjustment in the community.

"5. Accordingly, on June 20, 1979 I dispatched a notice to Mr. Artway indicating that on the previous day the SCRB had determined, based upon Rotgers' report and material filed in his SCRB folder, that he was not ready for parole consideration and advised him that he should participate in therapy."

The plaintiff instituted this suit on July 30, 1979. On May 8, 1980, the plaintiff filed a petition for resentencing before the Resentencing Panel of the Burlington County Superior Court. This action remained pending in the New Jersey courts until it was withdrawn by the plaintiff.[12] The

---

these factors convergent suggest a paranoid and psychopathic personality disorder."

At a June 19, 1979, meeting of the SCRB, that Board did not concur "with readiness [of plaintiff] for parole, since there is no evidence of participation in therapy since last review."

The record makes clear that defendants relied on "the classification materials" maintained by the Department of Corrections in making their reports and decisions concerning plaintiff. Defendant Rotgers also relied on his interviews and discussion with plaintiff for the purpose of determining "the presence of mental illness or health and capacity to function in society" (answer to interrogatory 41, Documents 14 & 18, D.N.J. Civil No. 79–2258). See also, for example, answer to interrogatories 16 and 24 by defendant Rotgers filed 9/18/79 (Documents 14 & 18 in D.N.J. Civil No. 79–2258). Plaintiff has a copy of defendant Rotgers' April 1979 report on his case.

12. The petition for resentencing was denied by the Burlington County Superior Court on September 23, 1980. The plaintiff appealed from that decision, but the appeal was dismissed by the Appellate Division at the insistence of the plaintiff. The per curiam order entered in *State v. Artway,* Superior Court of New Jersey, No. A–470–80T2, on October 16, 1981, reads as follows:

"After this case was listed for our calendar of October 6, 1981, we received a letter from defendant dated September 22, 1981 in which he states in part:
Defendant-appellant hereby concedes to the State's arguments, and withdraws his appellate briefs. Therefore, since the appeal is no longer viable, the appeal and its briefs are *not* to be submitted to the court. If you submit my briefs to the court, you will be

plaintiff now appeals from the June 9, 1980, order of the district court dismissing his complaint.

### IV.

This record requires affirmance of the district court judgment for several reasons.

### A.

■ The federal district court was precluded from interfering with the enforcement of the state criminal law on equitable grounds, which are the basic grounds alleged in this action seeking declaratory judgment and injunctive relief. *See Samuels v. Mackell*, 401 U.S. 66, 69, 91 S.Ct. 764, 766, 27 L.Ed.2d 688 (1971); *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971). In *Samuels v. Mackell, supra* at 69, 91 S.Ct. at 766, the Court based its opinion on

" . . . the settled doctrine of equity that a federal court should not enjoin a state criminal prosecution begun prior to the institution of the federal suit except in very unusual situations, where necessary to prevent immediate irreparable injury."

> doing so over my expressed objection, and I will bring federal suit against you regardless of the outcome of the case.
> The appeal is hereby dismissed."

**13.** In *Preiser, supra*, the Court said at pages 487, 489–90, 491–92, & 500, 93 S.Ct. at 1835–1837 & 1841:

> "In the case before us, the respondents' suits in the District Court fell squarely within this traditional scope of habeas corpus. They alleged that the deprivation of their good-conduct-time credits was causing or would cause them to be in illegal physical confinement, *i.e.*, that once their conditional-release date had passed, any further detention of them in prison was unlawful; and they sought restoration of those good-time credits, which, by the time the District Court ruled on their petitions, meant their immediate release from physical custody.
>
> \* \* \* \* \* \*
>
> "The broad language of § 1983, however, is not conclusive of the issue before us. The statute is a general one, and, despite the literal applicability of its terms, the question remains whether the specific federal habeas corpus statute, explicitly and historically designed to provide the means for a state prisoner to attack the validity of his confinement, must be understood to be the exclusive remedy available in a situation like this where it so clearly applies. . . .

It is clear that plaintiff bases his claim on equitable principles in his efforts to secure relief from the administration by the state courts of the provisions of Subtitle 11, Ch. 164, Articles 1 & 2, of the New Jersey Statutes Annotated. Subtitle 11 is entitled "Criminal Procedure."

In addition, particularly because of the availability of a state court remedy through appeal from the September 23, 1980, denial of the May 8, 1980, petition for resentencing and plaintiff's October 1981 withdrawal of the appeal in the Appellate Division from that denial after the federal district court had entered its final judgment in this case (*see* note 12 above), we believe *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), requires that on this record the relief which plaintiff seeks is only available by federal habeas corpus under 28 U.S.C. § 2254, and plaintiff's failure to exhaust his state remedies precludes such a suit. *See Preiser v. Rodriguez, supra* at 487, 489–90, 491–92, & 500, 93 S.Ct. at 1835–1837 & 1841.[13]

> "In amending the habeas corpus laws in 1948, Congress clearly required exhaustion of adequate state remedies as a condition precedent to the invocation of federal judicial relief under those laws. It would wholly frustrate explicit congressional intent to hold that the respondents in the present case could evade this requirement by the simple expedient of putting a different label on their pleadings. In short, Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983.
>
> \* \* \* \* \* \*
>
> " . . . The respondents, we think, view the reasons for the exhaustion requirement of § 2254(b) far too narrowly. The rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity. That principle was defined in *Younger v. Harris*, 401 U.S. 37, 44 [91 S.Ct. 746, 750, 27 L.Ed.2d 669] (1971), as 'a proper respect for state functions,' and it has as much relevance in areas of particular state administrative concern as it does where state judicial action is being attacked. That comity considerations are not limited to challenges to the validity of state court convictions is evidenced by cases such as *Morrissey v. Brewer* [408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484],

Insofar as plaintiff's damage claim is concerned, plaintiff has shown no action by defendants entitling him to damages, particularly because of his refusal to cooperate with the therapy programs offered to him. See note 11 above.

### B.

Also, we have concluded that there was nothing unconstitutional in the action of the SCRB in the procedures it used, as described above, or in the June 1979 notice sent to plaintiff by Dr. Pallone. We note that plaintiff has repeatedly been urged to participate in therapy but had refused to do so at the date of his July 30, 1979, complaint. We agree with the district court in its rejection of plaintiff's contentions that N.J.S.A. 2A:164–3 ff. is so vague that it is unconstitutional and violates the due process clause of the Fourteenth Amendment substantively and procedurally.

In *State v. Clark, supra* at 435, 323 A.2d 470, the court said that the test to be applied in determining a sex offender's eligibility for release from confinement is a "reasonable certainty that repetition of the [sexually aberrant] conduct will not occur." A sex offender such as plaintiff has no right to parole under the applicable New Jersey statute (see note 11 and pp. 1172–

1173 above) prior to the expiration of the 20-year maximum term specified for the crime of sodomy. *See Conn. Board of Pardons v. Dumschat,* 452 U.S. 458, 463, 101 S.Ct. 2460, 2463, 69 L.Ed.2d 158 (1981); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), holding that a criminal conviction extinguishes an individual's right to liberty; *State v. Dalonges,* 128 N.J.Super. 140, 319 A.2d 257 (App.Div.1974). N.J.S.A. 2A:164–8 provides that "any person committed to confinement . . . may be released under parole supervision when it shall appear to the satisfaction of the state parole board, after recommendation by a special classification review board . . . that such person is capable of making an acceptable social adjustment in the community." The ultimate decision on plaintiff's release from confinement, therefore, lies with the Parole Board. It is noted that clinical psychologist Rotgers found in April 1979 that plaintiff showed strong paranoid and psychopathic personality features, that he was evasive and avoided dealing with himself, that he showed clear evidence of a character disorder, and that it was problematical whether plaintiff could function in society without further sexual offenses. Therefore, there was no reasonable certainty that repetition of the conduct would not "occur."

*supra,* where the petitioners' habeas challenge was to a state administrative decision to revoke their parole, and *Braden v. 30th Judicial Circuit Court of Kentucky* [410 U.S. 484, 93 S.Ct. 1723, 35 L.Ed.2d 443], *supra,* where the petitioner's habeas attack was on the failure of state prosecutorial authorities to afford him a speedy trial.

"It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. . . . Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. Moreover, because most potential litigation involving state prisoners arises on a day-to-day basis, it is most efficiently and properly handled by the state administrative bodies and state courts, which are, for the most part, familiar with the grievances of state prisoners and in a better physical and practical position to deal

with those grievances. . . . The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.

\* \* \* \* \* \*

"What is involved here is the extent to which § 1983 is a permissible alternative to the traditional remedy of habeas corpus. Upon that question, we hold today that when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." Thus, it would appear that the proper procedure would be for the plaintiff to first present his contentions in the state courts by writ of habeas corpus or some similarly available remedy.

We have concluded that the New Jersey Sex Offender Act does not violate the due process clause of the Fourteenth Amendment on the facts of this case, where plaintiff has been found guilty of a crime and is confined due to that conviction after the sentencing judge, in applying the Sex Offender Act at the sentencing proceeding, has found that plaintiff's commission of the felony of sodomy was "vicious, . . . violent, forceful" and he should "not . . . go free to hurt or . . . abuse anyone else." [14]

### C.

We reject plaintiff's contention that the standards used in determining his eligibility for parole consideration under the New Jersey Sex Offender Act violated the due process clause of the Fourteenth Amendment. We rely on Supreme Court decisions such as *Conn. Board of Pardons v. Dumschat, supra,* 452 U.S. at 463, 101 S.Ct. at 2463, where the Court said:

"In *Greenholtz,* far from spelling out any judicially divined 'entitlement,' we did no more than apply the unique Nebraska statute. We rejected the claim that a constitutional entitlement to release from a valid prison sentence exists independently of a right explicitly conferred by the State. Our language in *Greenholtz* leaves no room for doubt:

'There is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." ' 442 U.S., at 7 [99 S.Ct., at 2103] (emphasis supplied; citation omitted).

"*Greenholtz* pointedly distinguished parole revocation and probation revocation cases, noting that there is a 'critical' difference between denial of a prisoner's request for initial release on parole and revocation of a parolee's conditional liberty. *Id.,* at 9–11 [99 S.Ct. at 2104], quoting *inter alia,* Friendly, 'Some Kind of Hearing,' 123 U.Pa.L.Rev. 1267, 1296 (1975). Unlike probation, pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review. Cf. *Meachum v. Fano,* 427 U.S. [215] at 225 [96 S.Ct. 2532, at 2538, 49 L.Ed.2d 451].

"A decision whether to commute a long-term sentence generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision. A commutation decision therefore shares some of the characteristics of a decision whether to grant parole. See *Greenholtz,* 442 U.S., at 9–10 [99 S.Ct. at 2104]. Far from supporting an 'entitlement,' *Greenholtz* therefore compels the conclusion that an inmate has 'no constitutional or inherent right' to commutation of his sentence.

\* \* \* \* \* \*

"The statute imposes no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied by the Board. Respondents challenge the Board's procedure precisely because of 'the absence of any apparent standards.' Brief for Respondents, at 28. We agree that there are no explicit standards by way of statute, regulation, or otherwise.

"This contrasts dramatically with the Nebraska statutory procedures in *Greenholtz,* which expressly mandated that the

---

**14.** These findings of the sentencing judge were equivalent to a determination that plaintiff was dangerous. Also, we note that in this case plaintiff had been found guilty of a crime, and decisions involving a person determined to be not guilty by reason of insanity or incompetent to stand trial are inapposite. See, for example,

*Benham v. Edwards,* 501 F.Supp. 1050, 1064 (N.D.Ga.1980), where the court said: "[Appellant has been found] responsible for criminal acts and as such [is] subject to the State's police power and its deterrent, punitive and retributive designs."

Nebraska Board of Parole 'shall' order the inmate's release 'unless' it decided that one of four specified reasons for denial was applicable. 442 U.S., at 11 [99 S.Ct. at 2105]. The Connecticut commutation statute, having no definitions, no criteria, and no mandated 'shalls,' creates no analogous duty or constitutional entitlement.

"It is clear that the requirement for articulating reasons for denial of parole in *Greenholtz* derived from unique mandates of the Nebraska statutes. Thus, although we noted that under the terms of the Nebraska statute, the inmates' expectancy of parole release 'is entitled to some measure of constitutional protection,' we emphasized that

'[T]his statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis.' *Id.*, at 12 [99 S.Ct. at 2106].

Moreover, from the standpoint of a reasons requirement, there is a vast difference between a denial of parole—particularly on the facts of *Greenholtz*—and a State's refusal to commute a lawful sentence. When Nebraska statutes directed that inmates who are eligible for parole 'shall' be released 'unless' a certain finding has been made, the statutes created a right. By contrast, the mere existence of a power to commute a lawfully imposed sentence, and the granting of commutations to many petitioners, creates no right or 'entitlement.'" (Footnotes omitted.)

### D.

We note that, even though the brief report of Rotgers includes in its last sentence this statement relied on by plaintiff, "[a]t

this point, I have no reason to conclude that Mr. Artway could not succeed on parole," that report also found specifically that plaintiff showed strong paranoid and psychopathic personality features, that he was evasive and avoided dealing with himself, that he showed clear evidence of a character disorder, and that it was problematical whether plaintiff could function in society without further sexual offenses. The SCRB considered the above findings of the Rotgers report to be particularly significant in deciding not to refer Artway's case to the Parole Board.

■ The decision of a recommending body such as the SCRB is not a proper subject of review by a federal court on this record. *See Conn. Board of Pardons v. Dumschat, supra; Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Rennie v. Klein*, 653 F.2d 836, 850 [15] (3d Cir. 1981) (en banc).[16]

### E.

■ We have concluded that *Winsett v. McGinnes*, 617 F.2d 996 (3d Cir. 1980), relied on by the amicus curiae, is inapposite to the facts in this record. In *Winsett*, at 1005–06, this court held ". . . there is no constitutionally mandated right to enter a discretionary parole release program" (617 F.2d at 1005), but ". . . the Due Process Clause may be triggered in a work release program . . . by official policies or practices" (617 F.2d at 1006). At pages 1007–08, the court said:

"In Delaware, there are specific criteria for work release which we believe if met, give rise to a liberty interest in work

---

**15.** In *Rennie, supra*, this court said at page 850: "A federal court is not to substitute its judgment for that of state legislative and executive authorities, unless the state's response in protecting the liberty interest falls short of constitutional standards."

**16.** We note that there is every reason to believe that if plaintiff will cooperate with the therapy prescribed by the New Jersey officials, which he has repeatedly rejected in the past (see, for

example, note 11 above), his condition will improve so that the state authorities will be able to make the finding that he is "capable of making an acceptable social adjustment in the community" provided for in N.J.S.A. 2A:164–8. There is no evidence in this record that plaintiff has been "detained longer than is necessary to accomplish" the reasonable certainty that repetition of his sex offenses will not occur. *See State v. Clark, supra*, 323 A.2d at 475.

release. Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. We hold that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy. We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary denial of work release, namely concern for public reaction and fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power. In other words, had they acted within the permissible scope of their discretion, Winsett would have been granted work release. To hold otherwise, would mean that the state-created interest in work release for eligible prisoners could be overridden simply by the prison officials' abuse of discretion. We therefore conclude that Winsett had a liberty interest protectible under the fourteenth amendment's guarantee of due process.

"Having concluded that Winsett has a protectible state-created interest in work release, we must now consider whether its denial could have violated the fourteenth amendment's guarantee of due process. Winsett's argument is primarily substantive in nature. The consideration of impermissible criteria, fear of public outcry and legislative reprisal, brought different treatment to Winsett than any other applicant to the work release program. We, however, perceive Winsett's argument as more properly implicating procedural due process rights. If the prison officials considered the extraneous criteria of public opinion and legislative reaction, the normal procedure for considering work release applications was

distorted to Winsett's detriment. Under the work release program, the applicant is entitled to have his application approved if all eligibility criteria are met and the prison authorities approve the application. If the authorities do not properly exercise their discretion, the process due under the work release program is denied."

There is no evidence in this case of any pressure being put on the SCRB and plaintiff had every opportunity to include any such material, if it existed, in the affidavits which he filed. This record requires the conclusion that plaintiff has not shown any due process denial, based on *Winsett*, entitling him to reversal of the district court judgment.

### V.

For the foregoing reasons, the final judgment of the district court will be affirmed.[17]

---

17. We note our appreciation of the able and helpful brief filed by the amicus curiae at the request of the court.