**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0625-19

IN THE MATTER OF THE
CIVIL COMMITMENT OF
J.S., SVP 24-99.

_____

APPROVED FOR PUBLICATION

May 24, 2021

APPELLATE DIVISION

Submitted May 4, 2021 – Decided May 24, 2021

Before Judges Yannotti, Haas, and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. SVP-24-99.

Joseph E. Krakora, Public Defender, attorney for
appellant J.S. (Joan D. VanPelt, Designated Counsel,
on the brief).

Gurbir S. Grewal, Attorney General, attorney for
respondent State of New Jersey (Melissa H. Raksa,
Assistant Attorney General, of counsel; Stephen
Slocum, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MAWLA, J.A.D.

J.S. appeals from a September 6, 2019 order finding he continued to be a

sexually-violent predator who must be civilly committed in the Special

Treatment Unit (STU) under the Sexually Violent Predators Act (SVPA),

N.J.S.A. 30:4-27.24 to -27.38. We affirm.

We previously described J.S.'s history of serious sexual offenses leading to his sentence to the Adult Diagnostic & Treatment Center (ADTC) in 1994, subsequent commitment to the STU in 1999, and continued commitment after various annual reviews from 2002 through 2014, as follows:

> In 1986, J.S. caused a four-year-old girl to lick his penis and caused her six-year-old brother to engage in sexual conduct. J.S. pled guilty to second-degree sexual assault, N.J.S.A. 2C:14-2(b), and was sentenced to four years of probation.
>
> Also in 1986, J.S. repeatedly forced a four-year-old boy to perform fellatio on him, and threatened to come back and kill him. In 1992, the boy revealed J.S.'s conduct. In 1994[,] J.S. pled guilty to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), third-degree terroristic threats, N.J.S.A. 2C:12-3(a), and third-degree witness tampering, N.J.S.A. 2C:28-5(a), and was sentenced to seven years in the . . . ADTC[].
>
> Meanwhile, in 1994 J.S. took pictures of a nude fifteen-year-old girl. He pled guilty to second-degree and fourth-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(b)(3) and (b)(5)(b), and fourth-degree criminal sexual conduct, N.J.S.A. 2C:14-3(b), and was sentenced to seven years in prison. The two seven-year terms were concurrent.
>
> [In re Civ. Commitment of J.S., No. A-3665-14 (App. Div. Aug. 27, 2018) (slip op. at 1-2).]

At the hearing leading to the prior appeal, the State presented two expert witnesses, Dr. Indra Cidambi and Dr. Tarmeen Sahni, who testified J.S.'s "mental conditions predispose J.S. to commit acts of sexual violence." Id. at 3.

2

Dr. Cidambi testified J.S. had "pedophilic disorder; unspecified paraphilic disorder; and an unspecified personality disorder with antisocial features. She found they affect him emotionally, cognitively, or volitionally." Ibid. Dr. Sahni similarly testified, while J.S. refused her interview, "his file showed he ha[d] pedophilia, [was] sexually attracted to both genders, non-exclusive type; paraphilia, not otherwise specified, with non-consent and sadistic features; and personality disorder, not otherwise specified, with schizotypal and antisocial traits." Ibid. J.S.'s expert witnesses testified he had "pedophilic disorder, non-exclusive type, [was] sexually attracted to both genders; conversion disorder; . . . personality disorder, not otherwise specified[;] . . . and bipolar disorder with strong indication of schizotypal personality disorder." Id. at 3-4. All experts agreed "as a result of his mental abnormalities or disorders, J.S. has serious difficulty controlling sexually violent behavior, and that it was highly likely he would reoffend if released." Id. at 4.

We noted J.S. did "not dispute that he satisfied the statutory standard for continued civil commitment." Id. at 6. Rather, he argued "the State failed to provide effective treatment . . . as required by the SVPA and the New Jersey Supreme Court, allowing J.S. to languish for fifteen years without proper psychiatric care"; "he fear[ed] for his safety at the STU due to the severe abuse that J.S. has testified he suffered"; and "the trial court found that he has not

made any progress in his treatment . . . and he is unlikely to make any progress in the future, rendering his continued commitment . . . punitive and unconstitutional." Id. at 4.

We concluded as follows:

> If J.S.'s complaints were inadequate to justify his transfer to [the Ann Klein Forensic Center, a less restrictive environment than the STU], they are certainly inadequate to justify his release into the community. . . . Security concerns should be addressed to the appropriate authorities, but they are not a basis under the SVPA for releasing J.S. into the community when it is highly likely that that he will commit new acts of sexual violence if released.
>
> [Id. at 20.]

This appeal arises from an annual review hearing pursuant to N.J.S.A. 30:4-27.35 and 27.32(a), which occurred over two days in August 2019. The State presented expert testimony from Dean DeCrisce, M.D. and J.S. also testified, against his attorney's advice. J.S. stipulated to the admission of the Treatment Progress Review Committee (TPRC) report prepared by Zachary Yeoman, Psy.D., who did not testify. Dr. DeCrisce offered detailed testimony elaborating on J.S.'s history, including allegations of repeated conduct similar to the offenses leading to his conviction and commitment, stating:

> [O]ne of them occurred in March 1994, where . . . this family contacted the police. [J.S.] called and a police report was made, and there was a discussion of setting up some type of taping of further phone conversations

when [J.S.] stopped making the calls and eventually the mother of the girl decided not to pursue the complaint.

But he had called a family under the ruse of asking for an older daughter who no longer lived there, and he ended up speaking to a [fifteen]-year-old girl, and kept her on the phone for four hours, talking about sexual matters, vulgar sexual matters, where he asked her to . . . define various sexual terms which are quite vulgar — what is a hand job? What's her understanding of fingering and all kinds of other obscene and offensive contact that she did not want to participate in, but she was intimidated or afraid of [J.S.] and never got off the phone. He tried to proposition her. It wasn't just a sexual crank call, if you will. He was trying to set it up to engage with her. He said we'll have sex together. I'll take it slow. I'll stop if you're in pain. I'll take you to get birth control pills. I'll always be there for you. And called her a few other times. And like I said, this ended up with a written police report, written victim statement, but the mother declined to sign a complaint and it didn't go forward.

And then a very substantial and significant note that does lead to further consideration of sadistic elements in [J.S.'s] arousal, when they had arrested him for . . . [having pictures of child pornography] in [a] lockbox, there were also a few credit cards and a license belonging to a particular woman, C.G. They identified and contacted this woman, and she spoke to them . . . .

. . . She said she dated [J.S.] for three years, that she had lived with [J.S.] for one year in his brother's home, and that he . . . beat her and repeatedly forced her to engage in . . . sex against her will on at least [twenty-five] occasions. . . . [O]n one . . . particularly unusually cruel occasion he had . . . threatened her at

A-0625-19

knife point to [fellate] a dog, and said ["]if you don't do it[,] I'm going to kill you.["]  And she refused to do it.  . . .  [T]his was happening in the home where he lived with his father.  He got called upstairs by his father for an unrelated issue, and he said when I come back if you haven't killed yourself I will.  And she reported that she took an overdose to kill herself and ended up in the hospital because she was afraid of [J.S.].

She said that [J.S.] used her as a means to an end[], and as long as he was getting his needs met[,] he didn't care about anything else.

. . . .

[T]hey did not charge [J.S.] with these reported offenses.  . . . But once again . . . police [had] taken [a] statement, and [this incident] appears to be kind of bizarre and cruel, somewhat in line to the offense that he actually was convicted of in terms of threatening the boy.

Dr. DeCrisce testified that, unlike other pedophiles, J.S.'s history was particularly different and sadistic because

ultimately [J.S.] has these offenses against three children occurring within a similar period of time when he's [eighteen] years old.  One of them is particularly an unusually cruel and even sadistic, urinating on the child in the trash can, and threatening to kill him, very unusual, even bizarre.

. . . .

. . . I've seen hundreds and hundreds of sex offenders, maybe done a thousand evaluations here over many years.  That's not the typical interaction with a child to terrorize and humiliate a child.  Most

6

A-0625-19

child offenders . . . aren't seeking in their own minds to purposely hurt the children. They're seeking to get their needs met in some distorted way, but they're not out to purposely hurt the child. Peeing in a trash can [on] the child[,] . . . kicking him in the groin, I mean, that's sadistic in nature. . . . I didn't ultimately give him the diagnosis of sexual sadism, but I understand that that is certainly a sadistic interaction.

Dr. DeCrisce explained that during his time in the STU, J.S. "had repeated allegations of sexual misconduct in some way or another, mostly related to phone use." Up until 2017, J.S. allegedly "repeatedly . . . call[ed] children . . . in other states, asking women about their children." He was also accused of making multiple harassing sexual phone calls to women, some of whom complained to the STU.

For example, he called a motel, engaged in a conversation with a woman who answered, turned the conversation sexual and then "ask[ed] her repeatedly about her [fourteen]-year-old daughter." He also engaged in a "Bible correspondence course," in which he had a follow-up phone call with a female member. He made "unusually uncomfortable remarks towards her and her friends, sexual in nature, asking them various personal questions . . . ." He requested she send a television to him in the STU and when the woman refused, "he sent her . . . a letter that was . . . hateful, verbally assaultive towards her, that appeared that he had urinated on it." He also allegedly gave the woman's information to a realtor, who contacted her to sell her home and

7

A-0625-19

sent her "odd magazine subscriptions that she did not order." Staff members also found him in possession of "sexually provocative information regarding telephone sex lines, implying that children or teenagers were involved."

Dr. DeCrisce testified he discovered numerous websites registered to J.S. One website's Facebook account stated: "[O]ur world vision is to make us a household name nationwide by assisting individual females and every single mom . . . or every single mom across the country in development of a healthier faith-based, God-fearing community." Dr. DeCrisce inferred J.S. is "using [the online platforms] as a tool to get women to call him, to contact him in some way so that he can have an easy access to people to harass." Dr. DeCrisce described these institutional infractions by J.S. as "significant" because he committed them even "while there are people watching [and] . . . monitoring him . . . ."

Further,

> although he denies it, he has been an incredibly sexually driven individual to repeatedly engage in these sexually motivated, harassing and even odd and somewhat sadistic phone calls over many years while he's been at the STU in a controlled environment, despite the fact that they have removed his telephone restrictions or tried to limit them on many, many occasions for which then [J.S.] responded by having hunger strikes, threatening and doing other bizarre things, spreading feces in his room, urinating under the door, very odd stuff, bizarre, bizarre stuff.

8

So it shows me that he's driven to perform these deviant acts despite the fact that he is here at the STU, they're trying to treat him, and he's rejected essentially all sex offender treatment for the most part, or [ninety-five] percent of it for the time that he's been here.

Dr. DeCrisce classified J.S. as a "treatment refuser," explaining STU's attempts to encourage him to engage treatment, including removing him from a standard process group and enrolling him in a mental health wellness group, which served those with psychiatric or severe mental health problems. He explained that when J.S. attended these group sessions at the STU, he showed "some empathy toward others in that context," but

> his treatment course has been riddled by drama, repeated MAP[1] placements, assaults, allegations of assaults, hunger strikes, threats, manipulations, repeatedly over years and years and years. He's been at the STU for almost [twenty] years. I believe he's completed two modules, maybe three, one of which was pass/repeat, meaning he showed up, he did the work, but they felt he didn't learn the material and he needed to take it again. He's done no programmatic written requirements.
>
> He has never . . . consistently attended self-help groups, and he has never met the recommendations of the TPRC or his treaters. He has remained in Phase 1 most of the time at the STU. He was elevated, I believe in 2017, to Phase 2 because between something happened to [J.S.]. . . . So in . . . 2017 to 2018 he gave his greatest effort in treatment, which

---

[1] This stands for Modified Activity Program, which the judge understood to be a status akin to "a form of discipline."

was great. . . . [T]hey elevated him or advanced him to Phase 2 of treatment, thinking . . . something has happened for him and he's starting to participate in treatment.

But then at the end of that year he started becoming disruptive in groups, laughing at other residents when they would share, writing a bunch of crazy appearing documents . . . containing significantly racist remarks and alleging that he was the subject of anti-Semitism and Jewish hate, and they ultimately put him on treatment probation and then pulled him out of the process group and put him into the mental health wellness group as I explained. . . . His last MAP placement was in 2018, briefly, after he alleged an officer assaulted him.

. . . .

[The numerous infractions] . . . gives testament to the nature of his personality structure and personality disorder, which has just been unremitting, . . . relentless, rigid and unchanging. He continues to do the same stuff that it appears to me that he was doing at the ADTC, as if nothing had changed in all these years. [Other treatment providers reported] . . . every interaction with [J.S.] is some type of negotiation, where he's fighting, manipulating for something. Everything. Whether it's in group. So he's been very difficult to treat. He's been brought up in administrative meetings which I have been part of for many years as a conundrum as to how to approach the treatment for [J.S.], once again because we don't want to have somebody languish in here.

Dr. DeCrisce concluded, if J.S. had

put [his energy] into his sex offender treatment in earnest he would have been out of here a long time ago, I believe, or at least he certainly had the potential

10

to be out of here. But he has been so focused on fighting, fighting for small entitlements, little things, to win, so to speak, little battles that he picks from time to time, that give him some satisfaction in life, that he has focused more on his short term desires and enjoyment than he has on the long term goal, which should be to get out of here.

Dr. DeCrisce testified regarding J.S.'s scores on the psychological testing, his clinical presentation, prognosis, and risk for re-offense—all of which the trial judge described in detail in his decision. J.S.'s primary diagnosis was unspecified paraphilic disorder with pedophilic, coercive, hebephilic,[2] and sadistic features. The second diagnosis was other specified paraphilic disorder, otherwise known as telephone scatalogia, which involves "making repeated sexually harassing and arousing phone calls to unsuspecting individuals despite troubles, sanctions, things of that nature." Third, Dr. DeCrisce diagnosed J.S. with an unspecified personality disorder, with "elements of schizotypal personality disorder, antisocial personality disorder, and paranoid personality disorder." The fourth diagnosis was for "possible" post-traumatic stress disorder (PTSD), stemming from a 2000 incident during

---

[2] "Hebephilia refers to a sexual preference in pubescent children, typically ages [eleven to fourteen]. In hebephilia, the focus of the sexual interest is on girls or boys who are just beginning to show secondary sex characteristics." Skye Stephens & Michael C. Seto, Hebephilic Sexual Offending, SEXUAL OFFENDING: PREDISPOSING ANTECEDENTS, ASSESSMENTS AND MANAGEMENT 29-43 (Amy Phenix & Harry M. Hoberman eds., 2016).

A-0625-19

which he was assaulted and hospitalized with a jaw and skull fracture. However, Dr. DeCrisce could not verify J.S.'s reported symptoms of PTSD because of his history of exaggerating and concluded this diagnosis did not "particularly relate to his risk, per se."

Dr. DeCrisce testified these diagnoses "substantially increase[ J.S.'s] risk to sexually reoffend" because they contribute to "impulsivity, poor problem solving abilities, social discord and conflict which inhibit or interfere with his ability to meet his intimacy needs in an appropriate manner."  Dr. DeCrisce opined J.S.'s prognosis and chances for improvement were limited.  He stated:

> I am under no illusion . . . that [J.S.] is going to completely drastically change his treatment focus and become a treatment star at the STU.
>
> . . . .
>
> . . . I don't think people change like that.  I just don't think it works that way, unfortunately.  But I do think that he is capable of participating more than he has in the past, and he can probably achieve some basic behavioral stability and some basic treatment understanding that may be adequate enough for his treatment providers, the TPRC, [and] myself at some future time to mitigate his risk.

Dr. DeCrisce concluded because J.S.'s personality disorders are not the type to "spontaneously remit," and he has not "had enough treatment . . . at the STU in order to be able to adequately control [his] impulses," J.S. has a "[v]ery high" likelihood of reoffending if released.

12

During a recess, while J.S.'s counsel was outside the courtroom, J.S. asked the trial judge if he could give him a letter. The judge informed J.S. "[he] would not accept [the letter] unless [J.S.'s attorney] gave it to [the judge after the attorney had] . . . an opportunity to review it." When J.S.'s counsel returned to the courtroom he stated J.S. indicated he wanted to submit the letter, but "made it clear to [counsel] that he [did] not want [counsel] to read it prior to submitting it to the [c]ourt." Counsel informed the court he advised J.S. he did not think that was a "sound legal strategy, but nonetheless he is choosing to do that," against counsel's advice. The judge confirmed J.S. understood "if [the judge] look[ed] at that letter and . . . interpret[ed] it fairly as something supporting continued civil commitment, [he could] very well use that letter [as evidence]." The letter was admitted into evidence.

J.S. then testified claiming his twenty-year commitment was "illegal," the product of disparate treatment and "anti-Semitic discrimination hate crime at multiple levels." He argued the STU "forc[ed]" him into group treatment and a "one size fits all" treatment violated the SVPA, which requires "appropriately tailored" treatment. He testified he "only do[es] good in one-on-one" treatment, which he requested, but was denied. He claimed he was the victim of "three anti-Semitic hate crimes" during the commitment, including two assaults and a sexual assault. He also testified he suffered a heart attack,

13

his doctor informed him he had "a year or two" to live, and he did not want to die in the STU.

During summations, J.S.'s counsel argued although J.S. had "a lot of disciplinary infractions[,]" the court should focus on the sexually violent offenses. Counsel argued that during the twenty-five years J.S. has been confined, "[h]e has not engaged in any behavior that would be considered a sexually violent offense or an attempt at a sexually violent offense, despite access to a victim pool . . . ." Counsel also noted "there [were] five years where [J.S.] was in the community where he did not engage in any behavior that was a sexually violent offense." Addressing the allegations of harassment raised in Dr. DeCrisce's testimony, counsel argued confinement was not the appropriate remedy because "[i]f [J.S.] engages in the type of harassing behavior that he . . . is alleged to have engaged in" he could be criminally prosecuted. Counsel argued J.S. should be released because his medical conditions are "accelerating the end of his life."

The trial judge issued a nineteen-page written decision, which outlined the evidence and the arguments we described above. Regarding J.S.'s letter, the judge noted it was approximately "fifty pages of written material, including questionnaires with his answers and a family tree of his paternal and maternal families." The judge noted the document was handwritten, "illegible," and

14

included margin notes and "interlineations." The document was addressed to judiciary and elected officials, and the Attorney General, and requested the trial judge communicate with the judge who sentenced him. The document also included a letter written to another judge accusing the Office of the Public Defender of "seriously 'Anti-[Semitic]' and unethical practice [and] numerous violations under [the] RPC[s]" and "aid[ing] and abett[ing]" the Department of Health.

The trial judge credited Dr. Yeoman's report and Dr. DeCrisce's testimony. However, the judge stated he was not "heavily rely[ing] on the actuarial data assembled by the experts" from the psychological testing, noting it was "simply a factor" for consideration.

The judge focused on J.S.'s lack of effort to embrace the treatment opportunities and stated:

> That J.S. has wasted nearly twenty years of time railing against the system, religious hatred, and the STU and attorneys commissioned to represent residents is profane. As the professionals expressed, had he devoted the amount of energy to his own personal improvement that he did to claiming that the system is corrupt, he probably would have been released fifteen years ago.

Despite J.S.'s treatment refusal, the judge found "[a]n important mitigating factor is J.S.'s changed attitude toward treatment, beginning in 2017." However, the judge concluded the change was

outweighed by the limited progress that J.S. has made in treatment and self-understanding; his poor self-regulation; his lengthy disengagement from treatment, which accounts more for his placement in Phase 2 than anything else; the nature and extent of his acting out; his refusal to address his medical conditions in anything but a cursory manner; and his general presentation (exemplified by the material which he submitted to the court . . .).

The judge found "[t]hese circumstances do not justify lowering J.S.'s risk of sexually offending at this time."

The judge concluded "[t]he State has proven by clear and convincing evidence that J.S. is highly likely to reoffend sexually if released from the STU; it is highly likely that, if released, J.S. will have serious difficulties in controlling sexually harmful behavior and will reoffend."  The judge continued J.S.'s commitment to the STU.

J.S. raises the following arguments on this appeal:

> COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY STIPULATING TO THE ADMISSION OF THE T.P.R.C. REPORT, BY FAILING TO PROVIDE NOTICE THEN FAILING TO RAISE THE ISSUE WHETHER THE S.T.U. WAS PROVIDING APPROPRIATE TREATMENT AND FAILING TO CONDUCT A DIRECT EXAMINATION OF J.S. AT THE ANNUAL REVIEW HEARING.  (Not Raised Below).

A-0625-19

I.

"The scope of appellate review of a trial court's decision in a commitment proceeding is extremely narrow." In re J.P., 339 N.J. Super. 443, 459 (App. Div. 2001) (citing State v. Fields, 77 N.J. 282, 311 (1978)). "The reviewing judge's determination should be accorded 'utmost deference' and modified only where the record reveals a clear abuse of discretion." Ibid. (quoting Fields, 77 N.J. at 311). This is because "[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). Therefore, we "give deference to the findings of trial judges because they have the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

We "should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

17

## II.

J.S. argues he did not receive effective representation from his attorney, which prejudiced the outcome of the hearing. He notes there is no precedent applying Strickland v. Washington, 466 U.S. 668 (1984) and State v. Fritz, 105 N.J. 42 (1987) within the context of an SVPA commitment proceeding.

J.S. argues the "paramount" issue was the fact the treatment offered by the STU was "inadequate and inappropriate." He claims his counsel was ineffective for not giving notice that J.S. intended to raise this issue. He also claims counsel was ineffective for stipulating Dr. Yeoman's report into evidence, thereby waiving cross-examination, leaving "sufficient evidence to sustain the State's burden unchallenged." J.S. asserts counsel's errors prevented him from proving "that despite a very mixed treatment trajectory, J.S. had command over several areas of treatment and had articulated to the [TPRC] the reasons why he felt he could not succeed in group sessions and needed to have individual treatment." J.S. further argues that after he testified that he was not receiving proper treatment, his counsel should have asked for a recess to "discuss with J.S. what he intended to say and to prepare some sort of focused direct examination" rather than permitting J.S. to testify in narrative fashion.

18

Our Supreme Court has held "[c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." In re Commitment of W.Z., 173 N.J. 109, 125 (2002) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)). Therefore, "[t]he individual who is the subject of the [commitment] hearing has the right to notice of the hearing, the right to present evidence and the right to be represented by counsel." In re S.L., 94 N.J. 128, 137 (1983). N.J.S.A. 30:4-27.14(a) states: "A person subject to involuntary commitment to treatment has the . . . right to be represented by counsel or, if indigent, by appointed counsel . . . ."

The right to counsel exists under the Sixth Amendment of the United States Constitution and article I, paragraph 10 of the New Jersey Constitution, and encompasses the right to adequate legal advice. Strickland, 466 U.S. 686; Fritz, 105 N.J. 58. There is a strong presumption counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. Further, because prejudice is not presumed, Fritz, 105 N.J. at 52, the party asserting an ineffective assistance of counsel claim must demonstrate "how specific errors of counsel undermined the reliability" of the proceeding. United States v. Cronic, 466 U.S. 648, 659 n.26 (1984).

19

Our Supreme Court has adopted the Strickland/Fritz test in other contexts. See N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 307 (2007) (holding a litigant in a termination of parental rights case must demonstrate that "(1) counsel's performance must be objectively deficient— i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense."); see also In re Adoption of a Child by C.J., 463 N.J. Super. 254, 261 (App. Div. 2020) (applying the aforementioned factors in consideration of appellate counsel's representation in a contested adoption case.). There is no precedent applying Strickland/Fritz to commitment proceedings of the sort in this case. Because commitment proceedings affect the fundamental liberty right of the individuals subject to them, and given the law expressly recognizes the right to counsel in these cases, Strickland/Fritz clearly applies.

Initially, we note that claims of ineffective assistance of counsel may be raised on direct appeal or on a post-judgment motion in the trial court. See B.R., 192 N.J. 309. Therefore, within the context of a commitment proceeding, such claims may be raised on an appeal from a commitment order, or an order continuing commitment. However, we will only consider such claims if the record is sufficient to address them, which is the case here.

20

Otherwise, a claim for ineffective assistance of counsel must be raised to the trial court in the first instance. Id. at 310-11.

We reject J.S.'s ineffective assistance of counsel arguments because they fail to meet either prong of Strickland/Fritz. J.S.'s counsel was not ineffective for stipulating Dr. Yeoman's report into evidence. The report provided historical background and was not the primary evidential source relied upon by the court to continue J.S.'s commitment. Rather, the State relied on Dr. DeCrisce's testimony, who had access to the same data and background materials as Dr. Yeoman and conducted his own investigation and drew his own conclusions. J.S.'s counsel cross-examined Dr. DeCrisce.

Importantly, the judge's findings focused on J.S.'s refusal to meaningfully participate in the treatment services offered at the STU. Given J.S.'s long history of refusal to accept treatment, his counsel would not have aided his cause by cross-examining Dr. Yeoman whose report contained evidence of J.S.'s non-compliance with treatment. Therefore, under the circumstances, counsel's decision to stipulate Dr. Yeoman's report into evidence rather than adduce harmful testimony was a strategic decision not ineffective assistance of counsel.

We are similarly unconvinced the mode of J.S.'s testimony prevented him from explaining to the court why group treatment was unsuccessful or that

counsel erred by not giving notice of J.S.'s intentions to address this issue. At the outset, we note J.S.'s decision to testify was not preplanned, but spontaneous. Nonetheless, not only did J.S. succeed in presenting his views in writing for the court to consider, but he also testified at length without objection from the State. We are unpersuaded this prejudiced the outcome because the record shows the trial judge carefully listened to J.S.'s testimony and asked him follow up questions.

Moreover, counsel's summation addressed the import of the points raised in J.S.'s testimony and the examination of Dr. DeCrisce, namely, that: J.S.'s infractions in the STU did not prove a high likelihood to reoffend; he was offense free while living in the community; and the court should consider his medical history and order his release. Furthermore, the judge's opinion shows he considered the salient portions of J.S.'s testimony, including the arguments relating to the nature of the treatment he was receiving, the evidence he presented, in addition to his counsel's arguments in favor of release.

For these reasons, there was no prima facie showing of ineffective assistance of counsel under Strickland/Fritz. The record clearly and convincingly established J.S. is highly likely to reoffend if released and his continued commitment to the STU is appropriate.

22

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0625-19